Jeremiah J. O'Donnell, Jr., et al. * v. Commissioner. O'Donnell v. Commissioner
Docket Nos. 94912-94916.
United States Tax Court
T.C. Memo 1964-38; 1964 Tax Ct. Memo LEXIS 298; 23 T.C.M. (CCH) 210; T.C.M. (RIA) 64038; February 19, 1964
*298 1. Held, that the daughters of the petitioners Jeremiah O'Donnell, Sr. and Margaret O'Donnell and the sister of Margaret O'Donnell were, together with the senior O'Donnells, bona fide members of a partnership, and that therefore the respondent erred in allocating to the senior O'Donnells the shares of partnership income reported as belonging to the two daughters and the sister. 2. Held, that the acquisition of control of a corporation, Wuskanut, by the partnership, was for the purpose of avoidance or evasion of Federal income tax by securing the benefit of the net operating loss of that corporation and that, therefore, in computing the taxable income of J. J. O'Donnell, Inc. (predecessor of the petitioner J. J. O'Donnell Woolens, Inc.) for its taxable year ended November 30, 1954, deduction of net operating losses of Wuskanut for its taxable years ended November 30, 1952 and 1953 are precluded by the provisions of section 129(a) of the Internal Revenue Code of 1939; held, also, that the deduction by J. J. O'Donnell, Inc. in such taxable year of the net operating loss sustained by Wuskanut in its taxable year ended November 30, 1952, is also precluded by the principle of Libson Shops, Inc. v. Koehler, 353 U.S. 382, *299 since the business giving rise to the income was not the same business as that giving rise to the net operating loss. 3. Held, that the transfer by the partnership of its sales agency business on January 4, 1954, to J. J. O'Donnell, Inc., which business was retransferred to the partnership on June 30, 1955, was merely a temporary shifting of the business to the corporation for the purpose of utilizing the net operating loss of Wuskanut for its taxable year ended November 30, 1952, as an offset against expected commission income, and that, accordingly, the respondent properly allocated the income and related expenses from the sales agency business from the corporation to the partnership during such period in order to prevent evasion of tax and clearly to reflect income of the corporation and the partnership pursuant to the provisions of section 482 of the 1954 Code and section 45 of the 1939 Code. 4. Held, that amounts paid, successively, by the partnership and by J. J. O'Donnell, Inc., as styling fees to a partnership known as Macauley & Holden constituted reasonable compensation for services rendered, but that, pursuant to section 482 of the 1954 Code, the amounts paid by the corporation *300 are deductible by the partnership, rather than by it; and that a portion of amounts paid by the corporation, as styling fees to the partners of Macauley & Holden, in its taxable year ended November 30, 1954, is deductible by it as ordinary and necessary business expenses. 5. Held, certain advances made by the partnership to an individual for use in real estate operations did not constitute debts, within the meaning of section 166(a) of the 1954 Code, since they were repayable only in the event such operations were profitable, and that no deduction on account thereof is allowable as a bad debt; held, further, that deductions for losses claimed after the partnership had taken over the real estate operations are not allowable since such losses have not been substantiated. 6. Held, that in computing the loss sustained by the petitioner Jeremiah O'Donnell, Sr. upon the liquidation of a corporation of which he was the sole stockholder, the corporation's claim against another individual for money loaned is includable at face value in the amount received upon liquidation, since the fair market value of such claim has not been proved; held, also, that a debt owed by such individual to the partnership *301 has not been shown to have become worthless in the partnership's taxable year ended June 30, 1955, and that no deduction on account thereof is allowable for such year. 7. Held, that the partnership is entitled to claimed deductions for travel and entertainment (or selling) expenses, but not for claimed advertising expenses, for lack of substantiation; held, also, that the petitioners Jeremiah O'Donnell, Sr. and Jeremiah O'Donnell, Jr. are not entitled to any deductions for travel and entertainment expenses for their taxable years 1954, 1955 and 1956, since such expenses were not ordinary and necessary expenses of any business personally carried on by either of them but were expenses of the partnership and of two corporations. 8. Held, that, for lack of substantiation, the petitioners, Jeremiah O'Donnell, Sr. and Margaret O'Donnell are not entitled to a greater deduction for religious and charitable contributions than allowed by the respondent. Richard H. Appert, 14 Wall St., New York, N. Y., Guy Budd Maxfield, and William D. Conwell, for the petitioners. Edward H. Hance, for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies *302 in income tax as follows: Dkt. No.
Petitioner
Year
Amount
94912
Jeremiah J. O'Donnell, Jr.
1954
$ 10,295.66
94913
J. J. O'Donnell Woolens, Inc., successor by merger to J. J. O'Donnell, Inc.
11/30/54
32,162.68
94914
J. J. O'Donnell Woolens, Inc., as transferee
of the assets of J. J. O'Donnell, Inc.
11/30/54
32,162.68
94915
Jeremiah J. and Margaret C. O'Donnell
1954
49,617.42
1955
120,354.84
1956
99,576.42
94916
Jermiah J. and Joan O'Donnell, Jr.
1955
21,926.68
1956
2,571.57 The respondent also determined an addition to income tax of petitioners Jeremiah J. and Joan O'Donnell in Docket No. 94916, pursuant to section 6654 of the Internal Revenue Code of 1954, for the calendar year 1956 in the amount of $1,013.53. The principal issues remaining for decision are: (1) whether the respondent erred in holding that a family partnership known as J. J. O'Donnell & Company consisted of only 3 persons (excluding 3 others) in the partnership's taxable years ended June 30, 1954, 1955, and 1956; (2) whether J. J. O'Donnell, Inc., predecessor of petitioner J. J. O'Donnell Woolens, Inc., is entitled to carry over and deduct in its taxable year ended November 30, 1954, net operating losses sustained by it in prior years; and (3) *303 whether the respondent erred in allocating to the partnership from J. J. O'Donnell, Inc. certain commission income and related expenses reported by the corporation for its taxable years ended November 30, 1954 and June 30, 1955. Other issues relate to the deductibility by the partnership of business bad debts, business losses, and traveling, selling and advertising expenses; the deductibility by petitioner Jeremiah O'Donnell, Sr. of a long-term capital loss, of travel, auto and hotel expenses, and of charitable contributions; and the deductibility by petitioner Jeremiah O'Donnell, Jr. of travel, auto and hotel expenses. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. The petitioners, Jeremiah J. O'Donnell and Margaret C. O'Donnell (sometimes hereinafter referred to as Jeremiah, Sr. and Margaret, and collectively as the senior O'Donnells), are husband and wife, residing in Bronxville, New York. They filed their joint income tax returns for the calendar years 1954, 1955 and 1956 with the district director of internal revenue at New York, New York. Such returns were prepared in accordance with the cash method of accounting. The petitioner *304 Jeremiah J. O'Donnell, Jr. (son of the senior O'Donnells and sometimes hereinafter referred to as Jeremiah, Jr.) and his wife Joan reside in Bronxville. Jeremiah, Jr. filed his income tax return for the calendar year 1954 and he and his wife filed their joint income tax returns for the calendar years 1955 and 1956 with the district director of internal revenue at New York. Such returns were prepared in accordance with the cash method of accounting. The petitioner J. J. O'Donnell Woolens, Inc. (sometimes hereinafter referred to as "Woolens"), is a Massachusetts corporation with its principal office in Farnumsville, Massachusetts, and is the successor by merger consummated on June 30, 1955, to J. J. O'Donnell, Inc. The latter filed its income tax return for the taxable year ended November 30, 1954, with the district director of internal revenue at New York. Such return was prepared in accordance with the accrual method of accounting. Family Partnership In 1948 the senior O'Donnells and Jeremiah, Jr. formed a partnership known as J. J. O'Donnell & Company. Each of the senior O'Donnells owned a 40 percent interest and Jeremiah, Jr. owned a 20 percent interest. The partnership engaged in *305 the business of selling, on a commission basis, woolen products manufactured by Somerville Manufacturing Company (sometimes hereinafter referred to as Somersville), the stock of which was not owned by the O'Donnell family. Its office was located in New York City. The partnership agreement of these three individuals was to terminate on January 2, 1955. Mary P. Holden and Virginia Ann DeLuca are daughters of the senior O'Donnells, and Catherine A. Macauley is a sister of Margaret O'Donnell. These three individuals were members of a partnership known as Macauley & Holden, which had been engaged in rendering, for compensation, valuable services as stylist specialists to J. J. O'Donnell & Company. On January 2, 1953, a partnership agreement was entered into by the senior O'Donnells, Jeremiah, Jr., Mary Holden, Virginia DeLuca (then Virginia O'Donnell), and Catherine Macauley. Therein it was recited that the senior O'Donnells and Jeremiah, Jr. were desirous of terminating their existing partnership agreement and executing a new agreement adding as new partners Mary Holden, Virginia O'Donnell, and Catherine Macauley. Therein it was provided that the six individuals would, as partners, engage *306 in and conduct the business of selling agents for manufacturers and dealers in textiles and of dealers in textiles, the term of the partnership to begin on January 2, 1953, and to continue until terminated by mutual agreement. Such agreement stated that the capital of the partnership would be the sum of $20,000, the respective contribution of each party to be as follows: the senior O'Donnells, $5,000 each; Jeremiah, Jr., $4,000; and Mary Holden, Virginia O'Donnell and Catherine Macauley, $2,000 each. It also stated that net profits and net losses of the partnership were to be shared by the partners in the following proportions; the senior O'Donnells, 25 percent each; Jeremiah, Jr., 20 percent; and Mary Holden, Virginia O'Donnell and Catherine Macauley, 10 percent each. It was also provided that upon termination of the partnership the net assets were to be distributed in the same proportions. It was further provided that any controversy among the partners should be submitted to and determined by arbitration by an arbitration association. This partnership (sometimes hereinafter referred to as "the partnership") continued to bear the name of J. J. O'Donnell & Company, and continued to *307 carry on essentially the same business. On January 2, 1953, Mary Holden, Virginia O'Donnell and Catherine Macauley each paid $2,000 to the partnership. All of the parties to the partnership agreement executed and filed with the clerk of New York County an amended business certificate, also dated January 2, 1953, stating that they were partners conducting or transacting the business. [1] *308 Shortly after January 2, 1953, Mary Holden, Virginia O'Donnell and Catherine Macauley each contributed an additional $6,000 to the partnership. Records of the partnership reflect the capital accounts of the six individuals as of the end of its fiscal years ended June 30, 1953 through June 30, 1956, as follows: 6/30/53
6/30/54
6/30/55
6/30/56
Jeremiah, Sr.
($ 18,255.43) *
($ 29,921.06) *
($ 18,287.10) *
$ 39,360.43
Margaret O'Donnell
37,742.80
29,809.47
22,787.10
66,602.01
Jeremiah, Jr.
15,091.49
11,434.96
20,504.47
69,295.62
Mary Holden
13,362.50
13,624.61
18,654.26
47,406.69
Virginia DeLuca
13,529.38
12,441.49
17,179.57
47,602.11
Catherine Macauley
13,574.54
12,166.65
16,721.12
45,108.10
Total
$ 75,045.28
$ 49,556.12
$ 77,619.42
$ 315,374.96
* (Deficit)
During the years 1953 through 1956 Jeremiah, Sr. drew against anticipated profits of the partnership $1,500 per month which was charged to his drawing account on the books of the partnership, and these withdrawals contributed toward the deficits in his capital account as of the end of each of the partnership years ended June 30, 1953 through 1955. Margaret O'Donnell similarly withdrew $1,000 per month during this period or a part thereof. During such years Jeremiah, Sr. acted in a supervisory and advisory capacity with respect to the partnership business; he performed no selling activities, but did participate, to some extent, in an advisory capacity with respect to styling. Jeremiah, Jr. participated in management decisions only, spending about 1 day per week at the office of the partnership. Margaret O'Donnell performed no services for the partnership. As shown infra the 3 individuals, as members of the other partnership, Macauley & Holden, performed styling services for the partnership for which such other partnership received *309 compensation at the rate of $900 per month. None of the six individuals drew a salary, as such, from the partnership. The partnership employed a sales manager and a number of salesmen. For 1952 and 1953, and from January 1, 1954 through August 31, 1954, Louis Stiller was sales manager for the partnership and for J. J. O'Donnell, Inc. (the stock of which was owned directly or indirectly by the O'Donnell family), receiving $52,231.90 in 1952, $33,040.74 in 1953, $46,605.16 for the first eight months of 1954 and $30,193.75 after he left the employ of the partnership for commissions he had earned. Stiller was replaced by Charles F. Callahan who received $10,000 from September 1, 1954 to December 31, 1954, $15,000 from J. J. O'Donnell, Inc., for the first six months of 1955, and $13,750 and $30,000 from the partnership for the last six months of 1955 and for 1956, respectively. During the years in question the partnership iaid its salesmen a stated monthly sum as an advance against commissions to be earned by them during the year. A reconciliation was made once each year between commissions earned and amounts drawn, but salesmen who drew in excess of commissions earned were not required *310 to repay such excess to the partnership. Instead, the partnership wrote off such excess on its books. From July 1, 1955 to December 31, 1956, the partnership employed 16 salesmen, paying them total salaries of $253,831 for this period. As a part of its business the partnership made expenditures for advertising and promoting the fabrics which it, as agent, sold. It provided styling services for Somersville, which is discussed infra. The direct cost to the partnership of producing various styling aids varied from $15,000 to $35,000 per year. One of the functions of the partnership in connection with its commission business was obtaining the approval by factors of the credit of its customers. On occasions the partnership in order to promote sales, orally guaranteed the credit of customers when the factor did not approve such credit, and the outstanding amount of such guaranteed accounts averaged between $50,000 and $200,000 during the period 1953 through 1956. The partnership did not incur any losses on account of such guarantees during the years 1953 through 1956, although it did sustain losses of approximately $47,000 in its fiscal year ended June 30, 1957, and of approximately $74,000 *311 in its fiscal year ended June 30, 1958, with respect to accounts which were guaranteed in 1953, 1954 and 1955. During the years 1953 to 1956 the partnership from time to time borrowed money from various banking institutions and from Woolens, the borrowing totaling about $1,270,000. Of this amount $262,800 was borrowed to finance the purchase of the stock of a corporation, discussed infra, a large part was borrowed to finance the purchase of securities, [2] *312 and an undisclosed part was borrowed for working capital. All of the six individuals signed, individually and as co-partners, notes issued by the partnership in connection with these loans. In connection with one of such loans they executed a collateral security agreement pledging 2,250 shares of the capital stock of John Alden Woolen Mills, Inc., owned by them, and in connection with another loan they executed a "Declaration and Agreement (Domestic Partnership)" representing and warranting to a bank that they constituted all of the general partners of the partnership. A comparison of the capital accounts of the six individuals as of the beginning and end of each of the partnership taxable years ended June 30, 1954 through 1956, taking into consideration the amount of income reported by the partnership for those years, discloses that Mary Holden, Virginia DeLuca, and Catherine Macauley made withdrawals from the partnership in the following amounts: Taxable Year
Taxable Year
Taxable Year
Ended 6/30/54
Ended 6/30/55
Ended 6/30/56
Mary Holden
$ 5,050
$ 5,835.55
Virginia DeLuca
6,400
$ 291.56
4,165.45
Catherine Macauley
6,720
475.17
6,201.01
In its returns for its taxable years ended June 30, 1954, 1955, and 1956 the partnership treated the six individuals as partners entitled to distributive shares of the various items of income or loss of the partnership in the proportions set forth in the partnership agreement. The distributive shares of the senior O'Donnells of the various items of partnership income shown in the partnership returns for such years, which were reported by the senior O'Donnells in their joint income tax returns for the taxable years 1954, 1955, and 1956, were as follows: Ordinary
Short-term
Partnership
net income
capital gain
Long-term
Dividend
Taxable Yrs.
(or loss)
(or loss)
capital gain
income
June 30, 1954
$ 19,613.62 *
$ 427.84
$ 6,519.06
June 30, 1955
(7,678.58) **
9,311.56
23,515.28
June 30, 1956
148,635.88
(65.44)
6,836.30
$ 17,667.50
*313 As shown infra, the partnership transferred its commission business to J. J. O'Donnell, Inc. on January 4, 1954, and reacquired such business on June 30, 1955. As a consequence the only income reported by the partnership for such period consisted of dividends and proceeds from sales of securities and other property. In the notice of deficiency the respondent determined that Virginia Ann DeLuca, Mary P. Holden, and Catherine A. Macauley were not partners in the partnership and increased the senior O'Donnells' share of partnership income by the shares reported as belonging to such three individuals. The respondent also made certain adjustments to the ordinary net income of the partnership. He determined the senior O'Donnells' distributive share of various items of partnership income or loss as follows: Senior O'Donnells'
Partnership Taxable Year Ended
Distributive
Share of
6/30/54
6/30/55
6/30/56
Ordinary net income
$ 82,692.63
$ 137,724.39
$ 248,147.31
Short-term capital gain or (loss)
684.56
14,898.50
(104.70)
Long-term capital gain
10,430.49
37,624.43
10,938.08
Dividends
28,268.00 Virginia Ann DeLuca, Mary P. Holden, and Catherine *314 A. Macauley were members of the partnership during its taxable years ended June 30, 1954, 1955, and 1956. Carryover of Net Operating Losses of Wuskanut and Allocation to Partnership of Certain Commission Income and Expenses of J. J. O'Donnell, Inc. In 1952 the O'Donnell family owned directly or indirectly the stock of John Alden Woolen Mills, Inc. (hereinafter referred to as Alden), which, in competition with Somersville, manufactured women's wear worsted fabrics. The O'Donnell family also owned directly or indirectly the stock of J. J. O'Donnell & Co., Inc., a New York corporation, which was the selling agent for Alden. In 1952 the mill which was operated by Alden, located at Worcester, Massachusetts, was inadequate to meet production needs. Such mill was held by Alden under a lease which would expire at some time early in 1954, and Alden was at that time having some difficulties with the lessor. For these reasons the O'Donnell family examined the facilities of 7 or 8 textile companies located throughout New England and as far south as Virginia, with a view to the acquisition of another plant. These companies all had net operating losses, as was generally the case with textile mills *315 in the New England area. Included among the companies examined was the Wuskanut Worsted Corporation, a Massachusetts corporation (sometimes hereinafter referred to as Wuskanut), which was located in Farnumsville, Massachusetts, between 8 and 12 miles from the Alden plant, and which manufactured and sold men's wear worsted fabrics. In the fall of 1952 representatives of the O'Donnell family commenced discussions with representatives of Wuskanut with respect to the purchase of the assets or stock of that corporation. The Wuskanut plant was located on a plot of ground suitable for future expansion and had an unlimited supply of free water. It had an excellent filtration plant, and turbines and boilers to produce steam, heat and electricity. There was also a reasonably good labor market. Most of the equipment in the Wuskanut plant was suitable for use in the manufacture of women's wear fabrics, although some additional equipment would be required for that purpose. Due to the difference between the men's wear fabric and the women's wear fabric businesses, substantial know-how would have to be obtained in order for Wuskanut to produce women's wear fabrics, its management not being trained *316 in that line. The partnership offered the Wuskanut stockholders a lump-sum price of $270,000 for all of the Wuskanut stock. This price was determined by having two appraisers value the real estate, machinery and equipment of Wuskanut. This offer was later reduced, in a written offer dated February 5, 1953, to $262,800 because of a sale by Wuskanut of a machine of a value of about $7,200. Although the offer was in the form of a lump-sum the partnership in arriving at such offer used $100,000 as the value of Wuskanut's building and land and $162,800 for its machinery and equipment. [3] The offer fixed February 21, 1953, as the last date for the deposit by the stockholders of their stock with their representative, Robert G. Pease, and fixed March 16, 1953, as the closing date. It was provided that payment should be made only if Pease was able to deliver all of the stock of the company at the closing date; otherwise the deposit was to be returned. It was also provided, alternatively, that if such offer should not be accepted on the closing date or if the conditions were not satisfied or waived by the partnership, then the partnership offered to purchase from Wuskanut its fixed assets free *317 of encumbrances for $262,800. At February 5, 1953, the majority of the stockholders of Wuskanut had approved the sale of the stock. Wuskanut had a net operating loss for its taxable year ended November 30, 1952, of which $257,329.87 was available as a carryover. During the negotiations between the parties no value was placed on this net operating loss. Neither Jeremiah O'Donnell, Sr., nor Wuskanut's representative discussed such loss as having a possible asset value, although the partnership's representatives were aware of the existence of such loss. On February 21, 1953, the partnership purchased for $262,800 all of the capital stock of Wuskanut. Of the purchase price, $25,000 was paid (as a deposit) at the time of the written offer on February 5, 1953, and the balance was paid on March 15, 1953. The purchase agreement provided in effect that the representative of the selling stockholders would dispose of Wuskanut's inventory and other current assets and pay its liabilities, such selling stockholders to receive any amount resulting from such dispositon over the liabilities *318 or to be liable for any excess of liabilities over the proceeds received on such disposition. The balance sheet of Wuskanut as of February 21, 1953, showed the following assets and liabilities: ASSETS
Cash on hand & in bank
$ 105,961.10
Accounts Receivable
50,819.52
Inventory
123,855.04
Net Book value of property, plant,
& equipment
209,404.08
Prepaid insurance
1,795.82
Total
$ 491,835.56
LIABILITIES
Current Liabilities
$ 361,764.29
Capital Stock
2,930.00
Earned Surplus, 11/30/52
119,151.88
Net Profit for period ended 2/21/53
7,989.39
Total
$ 491,835.26 In such balance sheet an amount of $53,395.92 was included as "Increment in accordance with terms of Agreement dated February 5, 1953." This amount when added to the net book value of the property, plant, and equipment, totals $262,800, the amount paid by the partnership to the stockholders of Wuskanut. Thereafter operations of Wuskanut continued until existing inventory was disposed of, which was in May or June of 1953. No additional inventory was purchased. As a result of the sale of such inventory and payment of liabilities, the selling stockholders received a net amount of $1,900. At an auction held on November 5, 1953, Wuskanut sold assets having a net *319 book value of $119,526.34. [4] Also, assets of Wuskanut having a book value of $74,835.09 were sold at private sales to various organizations, including Alden. The return of Wuskanut for its taxable year ended November 30, 1953, shows that it received $133,796.85 for sales of machinery and equipment during that year. The property sold represented fixed assets used in 3 of Wuskanut's 10 departments. On its return for its taxable year ended November 30, 1953, Wuskanut reported a net loss of $23,815.21, which takes into account a loss of $55,477.82 reported on the sale of machinery and equipment. At some time after November 1953, Wuskanut leased its real estate and plant to Alden for approximately 1 1/2 years. In December 1953, Wuskanut transferred such real estate and plant to a corporation known as Wuskanut Realty Corporation. *320 On January 4, 1954, J. J. O'Donnell & Co., Inc., the selling agent for Alden, was merged into Wuskanut, the name of which was then changed to J. J. O'Donnell, Inc. The returns of J. J. O'Donnell, Inc. show the same address in New York City as the address of the partnership. A balance sheet of Wuskanut just prior to the merger showed total assets of $64,658.23, consisting of cash in bank of $61,628.46, accounts receivable of $71.81, and "Machinery held for sale, net," of $2,957.96. From December 1, 1953, until the merger on January 4, 1954, Wuskanut, and thereafter until June 30, 1955, J. J. O'Donnell, Inc., derived no income from manufacturing, having ceased to manufacture. During such period J. J. O'Donnell, Inc. made substantial renovations to the plant, including the laying out of the plant more efficiently, the purchase of 48 newer looms from a textile mill in New Jersey, and the purchase of other equipment. The renovations were completed in July 1955. On June 30, 1955, effective July 1, 1955, J. J. O'Donnell, Inc. was merged into Alden, the name of which was then changed to J. J. O'Donnell Woolens, Inc., one of the petitioners herein. [5] Thereafter certain of the Alden machinery *321 and equipment was moved to the renovated plant on a gradual basis so that there would be no loss of production, the last piece of machinery being moved in July or August 1955. Thereafter operations ceased at the old Alden plant, and manufacturing operations commenced at the renovated Wuskanut plant on a full time basis, and have continued since that time. On January 4, 1954, the business of the partnership (consisting of acting as selling agent on a commission basis for Somersville) was transferred to J. J. O'Donnell, Inc. [6] Beginning in January 1954, the salesmen and other employees of the partnership were hired by J. J. O'Donnell, Inc. Creditors of the partnership were notified that the commission business was being conducted *322 by J. J. O'Donnell, Inc. From January 1954 through June 30, 1955, J. J. O'Donnell, Inc. carried on the sales activities previously conducted by the partnership and employed from 15 to 17 salesmen, paying them a total amount of $349,426 during such period. On June 30, 1955, the commission business was transferred by J. J. O'Donnell, Inc. back to the partnership. [7] *323 In its income tax return for its taxable year ended November 30, 1954, J. J. O'Donnell, Inc. reported net income (before any net operating loss carryover) of $195,639.59. Therein it reported total sales commissions of $588,571.97 and total deductions (aside from net operating loss deduction) of $407,287.66, which included compensation of Jeremiah, Sr. of $33,686, Margaret O'Donnell of $12,207, and Jeremiah, Jr. of $18,223. Therein it claimed a net operating loss deduction of $281,145.08 (consisting of net operating losses sustained by Wuskanut in the taxable years ended November 30, 1952 and 1953, in the respective amounts of $257,329.87 and $23,815.21.) In its return for its taxable period from December 1, 1954 to June 30, 1955, J. J. O'Donnell, Inc. reported taxable income (before any net operating loss carryover) of $135,665.96. Therein it reported total *324 sales commissions of $371,663.19 and total deductions (aside from net operating loss deduction) of $248,106.99, which included compensation of Jeremiah, Sr. of $26,980, Margaret O'Donnell of $9,610, and Jeremiah, Jr. of $18,175. Therein it claimed a net operating loss deduction of $85,505.49 (consisting of the unused portion of the aggregate net operating loss sustained by Wuskanut in its taxable years ended November 30, 1952 and 1953.) In its returns for its fiscal years ended June 30, 1954 and June 30, 1955, the partnership did not report any gross receipts from commissions received during the time that the commission business was operated by J. J. O'Donnell, Inc. (namely, January 4, 1954 through June 30, 1955). The respondent addressed a notice of deficiency to Woolens, as successor by merger to J. J. O'Donnell, Inc., determining a deficiency for the taxable year ended November 30, 1954, wherein he disallowed the net operating loss carryover deductions claimed by J. J. O'Donnell, Inc. "because the principal purpose for acquiring control of Wuskanut Worsted Corp. was to avoid income tax by securing the benefit of deductions not otherwise obtainable ( section 269(a) Internal Revenue Code of 1954) *325 and because the losses were sustained in a different business." The respondent also addressed a notice to Woolens determining that it is liable, as transferee of the assets of J. J. O'Donnell, Inc. for the deficiency in tax due from J. J. O'Donnell, Inc. for its taxable year ended November 30, 1954. In Docket No. 94914 Woolens by stipulation concedes that it is liable, as transferee of the assets of J. J. O'Donnell, Inc., for any deficiency determined by this Court to be due from J. J. O'Donnell, Inc. for such year. In notices of deficiency addressed to the individual petitioners the respondent determined that the commissions received by J. J. O'Donnell, Inc. from Somersville during the periods from January 4, 1954 through June 30, 1954, and from July 1, 1954 through June 30, 1955, should be allocated to the partnership, under section 482 of the Internal Revenue Code of 1954, "to prevent the avoidance of tax liability." He also determined that expenses and officers' salaries should also be allocated to the partnership on the basis of the ratio of Somersville commissions to total sales agency income received by J. J. O'Donnell, Inc. These adjustments to the partnership's ordinary net *326 income for its taxable years ended June 30, 1954 and 1955 were as follows: June 30,
June 30,
1954
1955
Commissions included in
income
$ 190,718.43
$ 492,364.69
Expenses allowed
117,929.60
261,100.09
Officers' salaries allowed
29,971.20
54,443.36 In the above notices to Woolens the respondent, consistently, eliminated commissions from corporate income and disallowed as deductions expenses and officers' salaries as follows: Period
Dec. 1,
Year Ended
1954 to
November 30,
June 30,
1954
1955
Commissions eliminated
$ 407,202.59
$ 275,880.53
Expenses disallowed
226,289.54
152,740.51
Officers' salaries disallowed
52,565.84
31,848.72
The principal purpose for the acquisition by the partnership of control of Wuskanut was the evasion or avoidance of Federal income tax by securing for the partners, as such and as stockholders of J. J. O'Donnel & Co., Inc., the benefit of a deduction of the net operating loss of Wuskanut for its taxable year ended November 30, 1952, the benefit of which they would not have otherwise enjoyed. The business operated by J. J. O'Donnell, Inc., during its taxable year ended November 30, 1954 and its taxable period beginning December 1, 1954 and ending June 30, 1955, was not substantially the same *327 business as that conducted by Wuskanut in its taxable years ended November 30, 1952 and 1953, in which it sustained net operating losses. The primary purpose of the partnership in transferring its selling business to J. J. O'Donnell, Inc. on January 4, 1954, was to effect a temporary shift of the business to the corporation in order to evade or avoid tax upon expected income from such business by utilizing as a deduction therefrom the net operating loss of Wuskanut for its taxable year ended November 30, 1952. Styling Fees Styling was an essential part of the business of the partnership as selling agent for Somersville. In 1950 the partnership employed the partnership of Macauley & Holden to perform its styling services, such services having been performed previously by Jeremiah O'Donnell, Sr. In addition, Somersville had a stylist of its own. As hereinbefore pointed out, the partnership of Macauley & Holden consisted of three partners, Virginia DeLuca, Mary Holden, and Catherine Macauley. It was formed in 1949 to engage in the business of designing, decorating, and styling woolen fabrics. It is a registered decorator and designer in White Plains, New York. The actual design work *328 was performed by Catherine Macauley and Mary Holden. The latter graduated from college as an art major and minor and continued her art studies thereafter. Such styling services rendered by Macauley & Holden consisted of research to determine profitable fabric designs and colors, the recommendation of new fabric designs and colors, the preparation of sample cards and other styling aids to be used by salesmen and the designing of labels used on the fabrics sold. In 1953 styling fees were paid by the partnership to the partnership of Macauley & Holden at the rate of $900 per month. After the partnership transferred its selling business to J. J. O'Donnell, Inc. on January 4, 1954, that corporation continued, until June 30, 1955, to pay the partnership of Macauley & Holden styling fees at the rate of $900 per month. In addition, for the period January 4, 1954 to November 30, 1954, it paid to each of the partners of Macauley & Holden an amount of $5,000. After the selling business was retransferred by the corporation to the partnership on June 30, 1956, the partnership resumed payments of styling fees to the partnership of Macauley & Holden, such payments being at the rate of $900 per month *329 during the taxable year ended June 30, 1956. In its returns for its taxable years ended June 30, 1954 and June 30, 1955, the partnership claimed deductions of $3,000 [8] and $10,800, respectively, for styling services. In its returns for its taxable years ended November 30, 1954 and June 30, 1955, J. J. O'Donnell, Inc. claimed deductions for styling expenses or services in the respective amounts of $24,900 and $6,300. In the notices of deficiency the respondent determined that the aggregate deductions to which the partnership and J. J. O'Donnell, Inc. were entitled for styling fees was at the rate of $700 per month ($8,400 per year) instead of the claimed rate of $900 per month ($10,800 per year) and disallowed the difference. He also disallowed to the corporation the claimed deductions of $5,000 paid to each of the three partners of Macauley & Holden for the taxable year ended November *330 30, 1954. For the period January 4, 1954 (the time the partnership business was transferred to the corporation) to June 30, 1955 (the time the business was retransferred to the partnership), the respondent allocated the styling fees which he allowed between the partnership and the corporation. The amount which he apportioned to the partnership and permitted as a deduction to it, as hereinbefore stated, was based upon the ratio of income received by the corporation from Somersville business to its total sales agency income. Thus, for the corporation's taxable years ended November 30, 1954 and June 30, 1955, the respondent allowed styling fees of $2,300 and $1,300, respectively, and for the partnership's taxable years ended June 30, 1954, June 30, 1955, and June 30, 1956, he allowed styling fees of $2,800, $6,200 and $8,400, respectively. Styling was also an essential part of the business of J. J. O'Donnell, Inc. as selling agent for Alden during the period from January 4, 1954 to June 30, 1955. During that period the partnership of Macauley & Holden rendered such styling services. In 1963 the partnership paid an annual salary of $20,000, plus a bonus in an undisclosed amount, to a stylist *331 whom it employed and who was unrelated to the O'Donnell family. In 1962 a manufacturer which was in competition with Woolens paid an assistant stylist a salary of approximately $17,500. The styling fees paid at the rate of $10,800 per year by the partnership and by J. J. O'Donnell, Inc. were paid for services in connection with the business of selling products of Somersville and constituted reasonable fees for such services. For the taxable year of J. J. O'Donnell, Inc. ended November 30, 1954, the reasonable value of styling services rendered to it by the partners of Macauley & Holden in connection with the business of selling products of Alden was $4,400. Real Estate Operations Burton T. Corning was a salesman for the partnership for many years, but left its employ and went to work for a competitor. Shortly thereafter he suffered a stroke. Upon his recovery he approached the partnership and asked that it assist him in establishing a real estate business in Long Island. Sometime in 1952 Corning and the partnership entered an oral agreement to the effect that the partnership would advance money to Corning which would be repaid out of profits and that after repayment of such advances *332 Corning and the partnership would share additional profits equally. Between July 7, 1952 and March 1, 1954, the partnership made numerous advances to Corning. It kept an account of such dealings under the heading "B. T. Corning - Real Estate Account." An analysis of such account shows all the advances to Corning and amounts received from him, and shows a balance in the account at March 31, 1954, of $14,320.92. It also shows that as of December 31, 1952, the amount of $5,500 had been written off as a bad debt. Since Corning had not been able to derive profits in the operation, the partnership on or about April 1, 1954, terminated its oral agreement with Corning, charged the amount of $14,320.92 off its books, and took over the operation of the real estate business itself. After that date the partnership made no further advances to Corning, but retained Corning as an agent or employee in the operation of such business. On occasions, both before and after April 1, 1954, Corning purchased houses in the name of Jeremiah O'Donnell, Sr., which were subsequently refurbished and sold. After April 1, 1954, the partnership sold at a profit some houses which had been acquired by Corning. In June *333 1956 the partnership sold the real estate business. On its return for its taxable year ended June 30, 1954, the partnership deducted under "Other Deductions" the amount of $14,320.92 on account of "Real Estate Operation." On its return for its taxable year ended June 30, 1955, the partnership deducted under "Other Deductions" miscellaneous expenses totaling $1,056.78. The return contains a notation that the $1,056.78 figure includes an amount of $577.76 as "real est oper." On its return for its taxable year ended June 30, 1956, the partnership deducted under "Other Deductions" the amount of $5,512.37 as "Real Estate Operation." In the notices of deficiency addressed to the individual petitioners the respondent increased the ordinary net income of the partnership by adding thereto "Real estate losses disallowed for lack of substantiation" for the years ended June 30, 1954, 1955, and 1956 in the respective amounts of $14,320.92, $841.43 and $5,512.37. Barker Transactions In 1948 Jeremiah O'Donnell, Sr. and Paul A. Barker, in consideration of contributions of $12,500 and $4,000, respectively, acquired the capital stock of Paul A. Barker, Inc., a New York corporation, which for a number *334 of years thereafter operated a yarn selling business. In November 1948 Jeremiah O'Donnell, Sr. contributed an additional $25,000 to the corporation. During the years 1950 through 1953 both Jeremiah, Sr. and Barker borrowed money from Paul A. Barker, Inc. The balance shown on the corporation's books as being owed by them as of January 1, 1954, were $24,500 and $14,775, respectively. The balance of $24,500 shown on the corporate books as owed to the corporation by Jeremiah, Sr. included an amount of $3,540.29 which, by agreement between the Internal Revenue Service and Jeremiah O'Donnell, Sr., had been treated as a taxable dividend to him in the calendar year 1950. On December 3, 1953, Barker surrendered his stock to the corporation. In October 1955 the corporation was liquidated. Jeremiah O'Donnell, Sr. received upon liquidation, as the corporation's sole stockholder, all the corporation's assets, which included notes receivable from himself (carried on the corporate books at the amount of $24,500) and cash in the amount of $1,104.71. Subsequently he paid the corporation's New York franchise tax liability in the amount of $25. On December 9, 1953 (which was shortly after Barker had *335 surrendered his stock in Paul A. Barker, Inc.), the partnership loaned Barker $3,000 to enable him to start a new yarn business. In 1955 Jeremiah, Sr. and the partnership contacted one of their attorneys with respect to the possibility of collection by the partnership and by Paul A. Barker, Inc. of their respective claims against Barker. The attorney had friendly relations with Barker and held discussions with him with respect to his business affairs and his financial status. He rendered his opinion that Barker was not good for a judgment, and recommended against any attempt at collection of either of the claims. He knew that Barker earned his living as a selling agent for certain mills, but had no personal knowledge of what assets Barker owned at that time. Barker did not repay the $3,000 loan to the partnership, nor apparently did he repay the $14,775 loan to the corporation. In his income tax return for the taxable year 1955 Jeremiah, St. claimed a long-term capital loss of $15,460.58 upon the liquidation of Paul A. Barker, Inc., showing his cost or other basis as $37,500 and the amount received by him as $22,039.42. [9] In the notice of deficiency the respondent disallowed the claimed *336 loss deduction, holding that Jeremiah, Sr. did not sustain any loss in 1955 on his investment in Paul A. Barker, Inc. In its return for its taxable year ended June 30, 1955, the partnership claimed as a business bad debt deduction the $3,000 which it had loaned to Barker. In the notices of deficiency to the individual petitioners, the respondent disallowed the bad debt deduction by the partnership. Travel, Entertainment and Advertising Expenses The partnership: In the ordinary conduct of the partnership's business the partners and the salesmen travelled and entertained. Whenever any partner or salesmen made any expenditure and requested reimbursement, such request for reimbursement was made through the comptroller's department which would review and approve such request. Such department retained vouchers and/or canceled checks showing the amount of all such travel and entertainment expenses, with the exception *337 that some salesmen's vouchers were kept for only a period of three years. During the partnership's taxable year ended June 30, 1954, the amount paid by the partnership on account of travel and entertainment amounted to $7,281.38, of which all was evidenced by checks or vouchers, except a relatively small amount of cash paid to Jeremiah O'Donnell, Sr. and Jeremiah O'Donnell, Jr. for out-of-pocket expenses. During the partnership's taxable year ended June 30, 1956, the amount so paid or accrued by the partnership totaled $15,949.72, of which all was evidenced by checks or vouchers except a relatively small amount of cash paid to Jeremiah O'Donnell, Sr. for out-of-pocket expenses. In its income tax returns for its taxable years ended June 30, 1954 and June 30, 1956 (prepared on an accrual method), the partnership deducted the respective amounts of $7,281.38 and $15,949.72 as travel and selling expenses. It also claimed deductions for those years in the respective amounts of $2,546.20 and $2,232.17 for advertising. In the notices of deficiency to the individual petitioners, the respondent disallowed as deductions to the partnership the respective amounts of $3,000 and $5,000 as being "Travel, *338 selling and advertising expenses disallowed for lack of substantiation and because it is deemed personal expenses." Jeremiah O'Donnell, Sr.: During 1954 through 1956 the residence and the business office of Jeremiah O'Donnell, Sr. were in New York City. During those years he spent an average of about 3 days per week at the Sommersville and Alden mills in Massachusetts, assisting in the development and manufacture of products. Nearly every week the owners and superintendent of Somersville went to New York and Jeremiah, Sr. expended money in entertaining them. All the expenditures made by Jeremiah, Sr. in connection with the above activities were made in behalf of the partnership or Alden or Woolens. He kept no record of these expenditures and was not reimbursed therefor by the partnership, Alden, or Woolens. In his income tax return for the taxable year 1954, Jeremiah, Sr. claimed as a deduction the amount of $1,983.40 as travel, automobile and hotel expenses; in his return for the taxable year 1955 he claimed as a deduction the amount of $1,816 as travel, auto and hotel expenses and gifts to customers for business; and in his return for the taxable year 1956 he claimed as a deduction *339 the amount of $2,376.25 as travel, auto and hotel expenses for business. In the notice of deficiency the respondent disallowed these claimed deductions, stating that they "are not allowable both for lack of substantiation and because not deemed ordinary and necessary." Jeremiah O'Donnell, Jr.: During 1954 and a part of 1955 the residence of Jeremiah O'Donnell, Jr. was in Worcester, Massachusetts. After his marriage in 1955 his residence was in Bronxville, New York. During those years his office was located in the Alden plant at Worcester. He spent most of his time working at the Alden mill, but spent about one day per week in the office of the partnership in New York City. During the years 1954 through 1956 he made expenditures for traveling between Worcester and New York and between Worcester and Boston in connection with production problems and the purchase of wool, for which expenditures he was not reimbursed. He also expended amounts in entertaining customers who came to the mill, for which he was not reimbursed. In his income tax returns for the taxable years 1954, 1955, and 1956, Jeremiah, Jr. claimed as deductions the respective amounts of $783.14, $847.12, and $989.15 for travel, *340 auto and hotel expenses. In the notices of deficiency the respondent disallowed these claimed deductions, stating that they were "not allowable both for lack of substantiation and because not deemed ordinary and necessary." Charitable Contributions In their joint income tax return for the taxable year 1954, Jeremiah O'Donnell, Sr. and Margaret O'Donnell claimed deductions for contributions to churches and various other religious or charitable organizations in the total amount of $4,115. Of this amount, $2,617 was paid by checks of the two individual petitioners. Of the amount so paid by checks, $450 was paid to St. Joseph's Church of Bronxville, New York. These petitioners and their children attended St. Joseph's Church and contributed to it. In the notice of deficiency the respondent disallowed $850 of the claimed contributions for the year 1954 on the ground of lack of substantiation. Opinion The first issue is whether the respondent erred in determining that Mary Holden, Virginia DeLuca, and Catherine Macauley were not members of the partnership, and in allocating to the senior O'Donnells the shares of partnership income reported as belonging to such other three individuals. There *341 are set forth in the margin pertinent provisions of the Internal Revenue Code of 1954 [10] *342 relating to family partnerships. In support of his determination the respondent, on brief, maintains that Mary Holden, Virginia DeLuca, and Catherine Macauley did not own the claimed aggregate 30% interest in the partnership and that in reality the senior O'Donnells assigned income to such three individuals. It is his position that even if such individuals did own capital interests in the partnership, they received them by gift from the senior O'Donnells, and section 704(e) of the 1954 Code and section 3797(a)(2) *343 of the 1939 Code would not apply to recognize them as partners for income tax purposes, since such sections deal only with partnerships in which capital is a material income-producing factor, and since, he contends, capital was not a material income-producing factor in the partnership. He, therefore, maintains that the partnership income attributed to such individuals' shares must be taxed to the senior O'Donnells. The petitioners, on the other hand, maintain that all six of the individuals should be recognized as partners. They contend that Mary Holden, Virginia DeLuca, and Catherine Macauley each owned a capital interest in the partnership; that capital was a material income-producing factor; and that accordingly, under the cited sections of the 1954 and 1939 Codes, the three named individuals must be recognized as partners, whether or not they derived such capital interests by purchase or gift from some other partner. It should be added that they contend that these interests were not derived by purchase or gift within the contemplation of the statute, but that a new partnership was created and that the interests of the three other individuals were derived by contributions of capital *344 to the enterprise. They also rely in general upon Commissioner v. Culbertson, 337 U.S. 733, wherein the Supreme Court set forth the test for determining the reality of a family partnership as follows: * * * whether, considering all the facts - the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent - the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. * * * We think the respondent was in error in determining that the daughters of the senior O'Donnells and the sister of Margaret O'Donnell were not members of the partnership in the years in question. From the partnership agreement it is clear that a new partnership was to be created, including these three individuals, and that each of the six individuals was to contribute a stated amount of capital. The evidence shows that the two daughters and the sister did contribute the amounts *345 specified, and that they also contributed additional substantial amounts of capital. The record does not specifically show the source of this capital, but there is no intimation, nor does the respondent contend, that it was received by them by way of gift. In this connection it appears that the three individuals had independent business interests, having conducted another business in partnership since 1949. The six individuals were acting at arm's length in forming and conducting the partnership. All of them held themselves out as being general partners and liable for the debts of the partnership, each of them signing notes for borrowed capital. The two daughters and the sister exercised control of their interests, withdrawing substantial amounts from the partnership from time to time. There is no suggestion that the senior O'Donnells exercised any control over the interests of the two daughters and the sister. Considering all the evidence presented, we think it clear that the six individuals in good faith and acting with a business purpose intended to join together in the conduct of the partnership business. It might well be that the bona fides of the partnership arrangement might *346 be questioned if the three individuals merely contributed capital (and no services) if in the partnership capital was not a material income-producing factor. Cf. Poggetto v. United States (C.A. 9), 306 F. 2d 76, affirming 193 F. Supp. 688. But here we are not faced with that problem, since we are satisfied that capital was a material income-producing factor in the partnership. The evidence establishes, as set forth in the Findings of Fact, that the partnership needed substantial amounts of capital on hand to pay stated monthly amounts to its salesmen, to defray costs of styling aids used in connection with the promotion of manufacturers' fabrics, and to secure its guarantees of customers' accounts. [11] Furthermore, it may be pointed out that a substantial portion of the partnership's income consisted of dividends received from securities and proceeds from sales of securities and other property. Indeed, during the period January 4, 1954 through June 30, 1955, substantially all the income actually received by the partnership was from these sources, since in that period the commission business was being operated by J. J. O'Donnell, Inc. Certainly capital was a material income-producing *347 factor during this period. The respondent contends that such capital should not be taken into consideration since it was not a part of the commission business and since the partnership was not conducting a business of dealing in securities. However, section 704(e) of the Code does not require that capital be used in a business, but merely requires that capital be a material income-producing factor. The respondent contends, alternatively, that even if the two daughters and the sister are recognized as partners, there must be deducted in computing the distributive shares of income, and taxed to the senior O'Donnells, an *348 amount representing reasonable compensation for services of the senior O'Donnells to the partnership. In so contending he relies upon section 704(e)(2) of the 1954 Code and section 191 of the 1939 Code. However, such provisions would apply only if it were concluded that the two daughters and the sister obtained their interests in the partnership by gift or purchase from the senior O'Donnells. As we have pointed out hereinabove, they did not acquire their interests in the partnership by gift or purchase from the senior O'Donnells, but participated in the formation of a new partnership, contributing their proportion of the capital thereof. On this issue we hold for the petitioners. Carryover of Net Operating Losses of Wuskanut [12] *349 A short recapitulation of the sequence of events will be helpful in understanding these issues. On February 21, 1953, the partnership, which, as pointed out above, consisted of members of the O'Donnell family, acquired all the stock of Wuskanut, a Massachusetts corporation, which had been engaged in the manufacture of men's wear worsted fabrics, which corporation had sustained a large net operating loss for its taxable year ended November 30, 1952. For its taxable year ended November 30, 1953, it also sustained a net loss, due to losses on dispositions of machinery and equipment. The O'Donnell family also owned J. J. O'Donnell & Co., Inc., a New York corporation, which was a selling agent for women's wear worsted fabrics manufactured by Alden, a Massachusetts corporation owned directly or indirectly by the O'Donnell family. *350 On January 4, 1954, J. J. O'Donnell & Co., Inc., was merged into Wuskanut, the name of which was then changed to J. J. O'Donnell, Inc. On the same date the partnership transferred to the corporation its business, which, as above shown, consisted of acting as selling agent for Somersville (a corporation not owned by the O'Donnell family which was engaged in the manufacture of woolen products). Thereafter J. J. O'Donnell, Inc. operated at a profit during its taxable year ended November 30, 1954, and its taxable period December 1, 1954 to June 30, 1955. During those two taxable periods substantially all of its income was derived from the two selling businesses, there being no income from manufacturing. Against the profits of these taxable periods it claimed deductions of the net operating losses sustained by Wuskanut in its taxable years ended November 30, 1952 and November 30, 1953. On June 30, 1955, J. J. O'Donnell, Inc. transferred back to the partnership the selling business which had previously been transferred to it by the partnership on January 4, 1954. On the same date J. J. O'Donnell, Inc. was merged into Alden, the name of which was then changed to J. J. O'Donnell Woolens, Inc., *351 whose business thereafter consisted of the manufacture of woolen materials. [13] The respondent, in determining the deficiency against Woolens (successor by merger to J. J. O'Donnell, Inc. and admitted transferee thereof) for the taxable year ended November 30, 1954, disallowed the net operating loss carryover deduction claimed by J. J. O'Donnell, Inc. on the ground that the principal purpose for acquiring control of Wuskanut was to avoid income tax by securing the benefit of deductions not otherwise obtainable, citing section 269(a) of the Internal Revenue Code of 1954, and also on the ground that the losses were sustained in a business different from that giving rise to the income. Since the taxable year of J. J. O'Donnell, Inc, involved commenced prior to December 31, 1953, it seems clear that section 129(a) of the Internal Revenue Code of 1939 *352 [14] is the pertinent provision rather than section 269(a) of the 1954 Code (in any event the provisions of both Codes are substantially the same). See section 7851(a)(1)(A) of the Internal Revenue Code of 1954. The respondent's determination that the principal purpose for the acquisition of the control of Wuskanut was to avoid tax by securing the benefit of a deduction of Wuskanut's net operating loss, which would not otherwise have been enjoyed, is presumptively correct, and the burden of proof is upon the petitioner to show that such determination was erroneous. American Pipe & Steel Corporation, 25 T.C. 351, affd. (C.A. 9) 243 F. 2d 125, certiorari denied 355 U.S. 906; Elko Realty Co., 29 T.C. 1012, *353 affd. (C.A. 3) 260 F. 2d 949; Zanesville Investment Co., 39 T.C. 406; J. T. Slocomb Co., 38 T.C. 752; and Snyder Sons Co, v. Commissioner, (C.A. 7) 288 F. 2d 36, affirming 34 T.C. 400, certiorari denied 368 U.S. 823. Petitioner Woolens contends that the principal purpose for the acquisition by the partnership of control of Wuskanut was to obtain its manufacturing plant and fixed assets for use in the conduct of the manufacturing business operated by the O'Donnell family through the medium of Alden, and not to secure the tax benefit of the net operating loss of Wuskanut. We are satisfied from the testimony of Jeremiah O'Donnell, Sr. and other witnesses that there was a need and purpose to obtain the land and building and a minor portion of the assets of Wuskanut for use in such business. Alden was operating in rented quarters which were inadequate and the Wuskanut plant was well suited to Alden's purpose in many respects. The land and building, which had been valued at about $100,000, were retained and leased to Alden, alterations being made to suit Alden's needs. However, of the machinery and equipment of Wuskanut, which had been valued at about $162,800, the greater portion *354 was sold during the year 1953. Waskanut's return for its taxable year ended November 30, 1953, shows sales of machinery and equipment of $133,796.85, of which an undisclosed amount was sold to Alden. Wuskanut's balance sheet as of January 4, 1954, shows machinery and equipment of a net book value of only $2,957.96, and the balance sheet indicates that these assets were for sale. There is no evidence as to the fair market value of such assets. Jeremiah O'Donnell, Sr. testified that while he knew that Wuskanut had a net operating loss and that "it was probably a nice dividend, if we could use it," the principal purpose of the acquisition of the stock of Wuskanut was not to obtain the deduction of the net operating loss, that the partnership would have bought Wuskanut even if it had not had a net operating loss, and that he believed that the partnership would have paid the same price for the stock if it had not had the net operating loss. William J. McKeon, who was comptroller of the partnership and who was also an employee of other O'Donnell interests, testified, in effect, that while he may have had conversations with Jeremiah O'Donnell, Sr. with respect to the tax benefits resulting *355 from acquisition of a corporation having a net operating loss, and that while to him as an accountant and tax adviser to the O'Donnell family such a net loss was important, the acquisition of such a tax benefit was not the principal purpose of Jeremiah O'Donnell, Sr. in acquiring control of Wuskanut. Robert G. Pease, who was treasurer of Wuskanut for many years and who represented its stockholders in the negotiations with the partnership, testified, in effect, that it was known to all the parties that Wuskanut had a net operating loss, since operating figures for the preceding 5 years were submitted, but that no emphasis was placed on the net operating loss in negotiations with representatives of the partnership, and that in discussions with Jeremiah O'Donnell, Sr. no reference was made to the net operating loss as having an asset value. It may be added that the price paid by the partnership for the stock of Wuskanut was apparently not in excess of the value of the plant, machinery and equipment, since the purchase price was fixed after appraisals. Despite this testimony, however, we think it must be concluded, upon the basis of the record as a whole, that the principal purpose for *356 the acquisition of control of Wuskanut was the evasion or avoidance of tax liability by obtaining the benefit of a deduction of the net operating loss sustained by Wuskanut for its taxable year ended November 30, 1952. At least we think the record is not sufficient to show that such was not the principal purpose. It is well established that the testimony of witnesses as to the principal purpose is not conclusive, and that such purpose must be gathered from all the facts and circumstances. Army Times Sales Co., 35 T.C. 688; Thomas E. Snyder Sons Co., 34 T.C. 400, affd. in Snyder Sons Co. v. Commissioner, supra; Frank Spingolo Warehouse Co., 37 T.C. 1; Urban Redevelopment Corporation, 34 T.C. 845, affd. (C.A. 4) 294 F. 2d 328. See also Cohen v. Commissioner, (C.A. 2) 148 F. 2d 336, affirming a Memorandum Opinion of this Court; Hartman v. Commissioner, (C.A. 2) 296 F. 2d 726, affirming 34 T.C. 1085; and Braunstein v. Commissioner, (C.A. 2) 305 F. 2d 949, affd. 374 U.S. 65, affirming 36 T.C. 22. While, as stated, we think there was a purpose to acquire assets for one of the O'Donnell family enterprises, the evidence does not show any business purpose for the acquisition of *357 the corporate entity and its continuation. There has been no showing that to acquire Wuskanut's assets it was necessary to acquire control of it rather than to directly purchase the assets of Wuskanut. Pease testified, in effect, that insofar as the stockholders of Wuskanut were concerned, it was immaterial whether assets were sold by Wuskanut or the stock of Wuskanut was sold, [15] although insofar as he was concerned, a sale of stock would be a simpler solution to his problem, as representative of the stockholders, of carrying out his duty of closing out the operation. [16] *358 Subsequent events support the respondent's determination. After control of Wuskanut was obtained by the partnership, the corporation liquidated its inventories and in a relatively short time ceased to carry on the manufacturing business it had theretofore conducted. It seems apparent that there was no intention of continuing to carry on Wuskanut's business other than to liquidate existing inventory. About 11 months after acquisition of control of Wuskanut, J. J. O'Donnell & Co., Inc., selling agent for Alden (both of which were O'Donnell *359 family interests), was merged into Wuskanut, which continued under the name of J. J. O'Donnell, Inc. Also, at the same time the partnership transferred to J. J. O'Donnell, Inc. its business as selling agent for Somersville, which business had theretofore been a profitable one. [17] Thereafter Wuskanut, under the new name of J. J. O'Donnell, Inc., operated the two selling businesses until June 30, 1955, deriving sufficient income therefrom to exhaust the available net operating loss of Wuskanut for its taxable year ended November 30, 1952, as well as its net loss for its taxable year ended November 30, 1953. Thereupon the selling business was retransferred by J. J. O'Donnell, Inc. to the partnership, and Alden was merged into J. J. O'Donnell, Inc., which thereafter operated under the name of Woolens, carrying on a manufacturing business. In view of the foregoing, we conclude that the respondent did not err in disallowing the deduction claimed by J. J. O'Donnell, Inc. for its taxable year ended November 30, 1954, of the net operating loss sustained *360 by Wuskanut in its taxable year ended November 30, 1952. The petitioner contends that in any event the respondent was in error in disallowing as a deduction for the taxable year ended November 30, 1954, the net operating loss of Wuskanut for its taxable year ended November 30, 1953, since such loss was sustained after the acquisition of control of Wuskanut by the partnership. It was within Wuskanut's taxable year ended November 30, 1953 (namely, on February 21, 1953), that the partnership acquired control of Wuskanut. It appears that up to February 21, 1953, Wuskanut had continued its business and derived profits. However, after that date and throughout the remainder of that taxable year sales of fixed assets of Waskanut resulted in a net operating loss of $23,815.21. The only business activity carried on after February 21, 1953, was the winding up of the manufacturing business which had theretofore been carried on by Wuskanut. Existing inventory on hand was disposed of and no new inventory was bought. Accordingly, it will be seen that the net operating loss of Wuskanut for its taxable year ended November 30, 1953, was directly related to the old business which was being discontinued. *361 Under these circumstances, we cannot agree with the petitioner that the respondent erred in disallowing this claimed net operating loss. It may well have been contemplated at the time of acquisition of Wuskanut that a benefit would be derived from a deductible loss resulting from the prospective sale of a large part of the fixed assets of Wuskanut (based on the difference between the depreciated cost of the assets and the price at which such assets could be sold). It seems fairly obvious that from the beginning it was contemplated that some of the fixed assets of Wauskanut would be sold, inasmuch as the testimony of both Jeremiah O'Donnell, Sr. and Joseph E. Mee, general manager of Alden, establishes, we think, that it was originally contemplated that some of the machinery would not be used because it was obsolete or not suitable. But whether or not the benefit of such a loss was specifically contemplated at the time of acquisition of control, we think section 129 would preclude the allowance of the deduction thereof. As pointed out hereinabove, we think the evidence shows that the principal purpose for the acquisition of Wuskanut by the partnership was to avoid tax. That being so, *362 we think section 129 operates to preclude the allowance of any deduction which would not be available but for the acquisition. In Temple Square Mfg. Co., 36 T.C. 88, we stated: Nothing in the language of the statutes indicates their application is to be confined to losses sustained by the loss corporation in the years before acquisition. Once the principal purpose of the acquisition is found, namely, to evade or avoid tax, any deduction which would not otherwise be available, is rendered unallowable. Again the legislative history is revealing. It shows Congress was legislating against securing any benefit of any deduction and nothing therein indicates any intention to limit the deductions for losses sustained in the years before acquisition. To accept petitioner's contention would thwart the clearly expressed purpose of the statutes. See also R. P. Collins & Co. v. United States, (C.A. 1) 303 F. 2d 142; Elko Realty Co., supra; and Zanesville Investment Co., supra, in which it was held that post-affiliation net losses of corporations were not allowable as deductions against consolidated income of the group of corporations, where the principal purpose of the acquisition of the loss *363 corporations was the evasion or avoidance of tax by the securing of the benefit of the deduction of either pre-affiliation or expected post-affiliation net operating losses. In the Zanesville case we stated: Petitioner also argues that the loss incurred by Muskingum in July 1956 on the sale of its assets, as distinguished from Muskingum's operating losses from January 1, 1956, through July 1956, does not fall within the interdicted purpose of section 269. We disagree. * * *
The argument here is a little different than the above case [R. P. Collins & Co. v. United States] for here the principal purpose was to secure the contemplated post acquisition operating losses. But the principle is the same. We do not believe that the statute requires at the time of acquisition a precise awareness of every deduction, credit, or other allowance that such acquisition will bring to the taxpayer. It is enough if at the time of acquisition the principal purpose was to obtain a tax benefit. We also think it is clear that the respondent's disallowance of the deduction claimed by J. J. O'Donnell, Inc. of the net operating loss of Wuskanut for Wuskanut's taxable year ended November 30, 1952, must be sustained *364 under the principle of Libson Shops v. Koehler, 353 U.S. 382, [18] *365 since the business in which the net operating loss was sustained was not substantially the same business as that which gave rise to the income sought to be offset by the carryover. The petitioner maintains that there was no change in the business of Wuskanut after the acquisition of control and after the merger of J. J. O'Donnell & Co., Inc. into it. The petitioner concedes that during the taxable year ended November 30, 1954, J. J. O'Donnell, Inc. (formerly Wuskanut) was not actually engaged in manufacturing, but contends that it had not terminated Wuskanut's business but rather that there was a temporary hiatus while the plant was being renovated. We cannot agree with this view expressed by the petitioner. Obviously the particular manufacturing business which had theretofore been conducted by Wuskanut, namely, the manufacture of men's wear worsted fabrics was discontinued and the business thereafter conducted *366 by the corporation until June 30, 1955, consisted of the selling businesses formerly conducted by the partnership and by J. J. O'Donnell & Co., Inc. Moreover, although effective July 1, 1955, the corporation did acquire, by merger with Alden, the business of manufacturing of women's wear fabrics, which was similar to the business theretofore conducted by Wuskanut in prior years, it was not the same business. See Julius Garfinckel & Co., 40 T.C. 870 (on appeal (C.A. 2)). The cases of Kolker Bros., Inc., 35 T.C. 299, and Goodwyn Crockery Co., 37 T.C. 355, affd. (C.A. 6) 315 F. 2d 110, cited by the petitioner are not applicable because they involved factual situations substantially different from that involved here. It should be added that it is unnecessary for us to here decide whether the Libson Shops principle would preclude the carryover and deduction of the net operating loss sustained by Wuskanut in its taxable year ended November 30, 1953, since we have held that such deduction is precluded by the terms of section 129(a). See R. P. Collins & Co. v. United States, supra.
Allocation to Partnership of Certain Commission Income and Expenses of J. J. O'Donnell, Inc. The respondent *367 allocated to the partnership the commissions from Somersville received by J. J. O'Donnell, Inc. during its taxable year ended November 30, 1954 and its taxable period December 1, 1954 through June 30, 1955, and also allocated to the partnership the portion of the officers' salaries and other expenses paid by the corporation which he determined pertained to the Somersville commission business. This resulted in an increase in the partnership taxable income for its taxable years ended June 30, 1954 and June 30, 1955, which in turn resulted in deficiencies against the individual partners who are petitioners herein for their taxable years 1954 and 1955. The respondent's stated reason for such allocations was "to prevent the avoidance of tax liability," citing section 482 of the Internal Revenue Code of 1954. Although section 482 of the 1954 Code is the pertinent provision with respect to the partnership's taxable year ended June 30, 1955, it seems clear that the provision pertinent to its taxable year ended June 30, 1954, is section 45 of the Internal Revenue Code of 1939. However, the two provisions are substantially the same. There are set forth in the margin the provisions of section 482 *368 of the 1954 Code. [19]
The respondent is vested with broad discretion under section 482 and his determination thereunder will be overturned only if abown to have been arbitrary or unreasonable. Ballentine Motor Co., Inc. v. Commissioner, (C.A. 4) 321 F. 2d 796, affirming Ballentine Motor Co., 39 T.C. 348, and cases cited therein. It has been stipulated that the commission business of the partnership was transferred to J. J. O'Donnell, Inc. on January 4, 1954, and that on June 30, 1955, such business was transferred back to the partnership. *369 The petitioners argue that this stipulation is dispositive of the issue. Their contention is that since the business was transferred, the commissions in question were earned by the corporation and that section 482 does not authorize the shifting of earnings of one entity to another, even though such entities are controlled by the same interests. The petitioners cite a number of cases for this proposition. [20] However, in each of those cases there was either a bona fide transfer at arm's length or there was a valid business purpose and tax avoidance was not the purpose of the transfer.
The record in the instant case does not establish that there was a bona fide arm's length transfer of the business by the partnership to J. J. O'Donnell, Inc. Insofar as the record shows, no consideration passed between the parties upon either the transfer of the business to the corporation or upon the retransfer to the partnership. While it was stipulated that creditors of the partnership were notified that the commission business was being conducted by the corporation, *370 there is no evidence as to whether any new arrangement was made with Somersville with respect to the conduct of such business by another entity. We think the evidence establishes that the primary purpose in transferring the business to the corporation was to effect a temporary shift of such business to the corporation in order to evade or avoid tax upon expected income from such business by utilizing as a deduction therefrom the net operating loss of Wuskanut for its taxable year ended November 30, 1952, and we have so found as a fact. As pointed out hereinabove under the previous issue, another element of the plan was to shift to the corporation the selling business which had been operated by J. J. O'Donnell & Co., Inc. Upon exhaustion of the net operating losses of Wuskanut the selling business was retransferred to the partnership. We cannot accept the view advanced by the petitioners that there was a bona fide business purpose for the transfer to the corporation and that the transfer was not for a temporary period. They claim that the transfer of the business to the corporation was to utilize the corporate form to limit possible liability in connection with the proposed conduct *371 of a selling office in Los Angeles, California. This claim, however, loses force in view of the fact that about a year and a half later the entire selling business was reconveyed to the partnership. On brief the petitioners state that when the business was transferred to the corporation there was no intention to reconvey the business to the partnership, but there is no testimony to that effect. The claim is made that the retransfer came about as a result of changed conditions, namely, the situation created by the merger of J. J. O'Donnell, Inc. and Alden. At that time the resulting corporation acquired the manufacturing business of Alden, an O'Donnell interest, and the claim is made that to have continued in the same corporation the business of sales agent for Somersville, whose products were in competition with the products of the new corporation, would not be consonant with good business relationships with Somersville. We cannot accept this as the reason for the retransfer. For the prior year and a half the corporation had been acting as selling agent for the products of both Somersville and Alden. The petitioners also state that the separation of the selling and manufacturing businesses *372 was made pursuant to the suggestion of banks with which the O'Donnells negotiated for a substantial loan. We can understand the interest of the banks in requesting the merger of the assets of the two corporations, but it would seem that any suggestion made by the banks with respect to the separation of the manufacturing and selling businesses would not constitute a requirement by the banks but a mere suggestion in the interest of simplicity. The instant case is, we think, governed by the principle of Ballentine Motor Co., Inc. v. Commissioner, supra. Here, as there, there was a temporary shift in the title to the income-producing asset or assets in an attempt to make use of a net operating loss carryover. In the Ballentine case the incomeproducing assets consisted of automobile inventories which were later transferred to another related entity upon exhaustion of the net operating loss. In the instant case no specific details are shown as to what assets were transferred by the partnership to the corporation, the stipulation merely stating that the business was transferred. From the partnership returns it would seem that a relatively small amount of furniture and fixtures and an automobile *373 were transferred. Since the partnership business consisted entirely of selling the products manufactured by Somersville there must have been a contract with that company. This would seem to have been its most important asset. Whether such a contract was transferred to the corporation has not been shown, but even if it was, it was a transfer for a temporary period. Here, as in the Ballentine case, the transferee employed the personnel of the transferor and used the premises previously used by the transferor to carry on the business. In the Ballentine case the automobile lots were under lease and, although the leases were not transferred, the transferee paid the rental. We see no essential difference between the situations here and in the Ballentine case, and we conclude, as we did in Ballentine Motor Co., supra, that it must be considered that the transferor earned the income in question. Under the circumstances we think it was necessary, in order to prevent evasion of tax and to clearly reflect the income of both the partnership and the corporation, to allocate the income from the selling business, as well as the expenses related thereto, to the partnership. We accordingly approve *374 the respondent's determination, except as thereafter held with respect to apportionment of styling fees. Styling Fees Prior to January 4, 1954, the partnership paid styling fees to Macauley & Holden at the rate of $900 per month, or $10,800 per year, in connection with the business of selling the products of Somersville. After such business was transferred to the corporation on January 4, 1954, the corporation continued to pay styling fees to the partnership of Macauley & Holden at such rate, and when the business was retransferred to the partnership on June 30, 1955, the partnership resumed such payments at the same rate. The respondent determined that the reasonable value of these services rendered to the partnership during the first 6 months of its taxable year ended June 30, 1954 and during its taxable year ended June 30, 1956, was only $700 per month, or $8,400 per year, and disallowed the difference. Hence, the primary question is whether the services performed were reasonably worth the amounts paid. We are satisfied from all the evidence that such services were essential to the selling business and furthermore that they were worth the amounts paid. There is much detailed testimony *375 as to the character of the services and the necessity therefor. It has also been shown that for the year 1963 the partnership paid to another stylist for similar services an amount of $20,000 per year, plus a bonus in an undisclosed amount, and that in 1962 a rival concern paid an assistant stylist a salary of about $17,500 per year. While these salaries were paid several years after the years in question, we think that they, together with all the other evidence, establish that the compensation which was paid to Macauley & Holden in the years in question was not unreasonable. As pointed out above, after the partnership had transferred its selling business to J. J. O'Donnell, Inc. on January 4, 1954, the corporation continued to pay styling fees to the partnership of Macauley & Holden at the same rate (plus the additional $15,000 paid to the three partners of the partnership of Macauley & Holden in the taxable year ended November 30, 1954). The corporation was also conducting the business of selling products of Alden. Macauley & Holden rendered styling services in connection therewith. The respondent took the position that the styling fees at the rate of $900 per month were paid for *376 the services of Macauley & Holden rendered in connection with sales of products of both Somersville and Alden. Pursuant to his determination that it was necessary to invoke the provisions of section 482 of the Code, he allocated to the partnership a portion of the styling fees which he determined to be applicable to the business of selling products of Somersville for both corporate taxable years ended November 30, 1954 and June 30, 1955. We agree, as pointed out above in our discussion of the applicability of section 482, that any such fees paid in connection with the Somersville selling business should be disallowed as deductions by the corporation for those years and allowed as deductions by the partnership. However, we think that the full amount paid to the partnership of Macauley & Holden as styling fees, namely, the payments at the rate of $900 per month, were paid by the corporation in connection with the Somersville business. We think this conclusion must be reached since that was the rate which had previously been paid by the partnership when its only business consisted of the sale of Somersville products. As pointed out above, we think such rate of compensation was reasonable *377 for services in connection with the Somersville business. The amounts paid to the partnership of Macauley & Holden at this rate will be disallowed as deductions to the corporation in its taxable years ended November 30, 1954 and June 30, 1955, and will be allowed as deductions to the partnership for its taxable years ended June 30, 1954 and June 30, 1955. Since services were rendered by Macauley & Holden to J. J. O'Donnell, Inc. in connection with its business of selling products of Alden, we think it reasonable to conclude that some portion of the amount of $15,000 paid by the corporation to the partners of Macauley & Holden in the corporation's taxable year ended November 30, 1954, constituted payment for such styling services. The respondent did not allow as a deduction any portion of such $15,000. While the record does not contain any direct evidence as to the value of the services rendered in connection with the Alden business, we think it incumbent upon us to allow the corporation some deduction as compensation paid for such services in that taxable year. Cohan v. Commissioner, (C.A. 2) 39 F. 2d 540. In the exercise of our best judgment, and bearing heavily against the petitioners *378 upon whom rests the burden of proof, we have concluded and have found as a fact that of the $15,000 paid by the corporation to the partners of Macauley & Holden in its taxable year ended November 30, 1954, $4,400 represents reasonable compensation for services rendered. This amount represents approximately the same ratio to the income derived by the corporation in its taxable year ended November 30, 1954, from sales of products of Alden as the ratio of the amount paid (at the rate of $900 per month in such taxable year) for styling services in connection with the Somersville business to the income derived in that year from sales of Somersville products. The amount of $4,400 will be allowed as a deduction to J. J. O'Donnell, Inc. for its taxable year ended November 30, 1954. The respondent makes much of the fact that J. J. O'Donnell, Inc. did not, in its succeeding taxable period ended June 30, 1955, pay or deduct any similar amounts paid to the partners of Macauley & Holden. We think, however, that this fact should not preclude the allowance for the taxable year ended November 30, 1954, of the portion of the amount paid which constitutes reasonable compensation for services actually *379 rendered. Real Estate Operations The transactions which the petitioner had with Corning are quite confusing. The record is far from adequate with respect thereto. Some of the evidence would seem to indicate that the partnership had entered into a joint venture with Corning in the operation of a real estate business in 1952. The agreement was that after repayment of certain advances out of earnings, the partnership would share equally with Corning any profits from the operation. On the other hand, the parties have stipulated that in 1953 the partnership "loaned" money to Corning to enable him to engage in the real estate business. Furthermore, in the petitioners' proposed findings of fact, to which the respondent stated in his reply brief he had no objection, it is stated that the agreement was that the partnership would "lend" money to Corning and that when the "loans were repaid" profits would be shared equally, that "loans were made" by the partnership to Corning between July 7, 1952 and March 1, 1954, and that as of March 31, 1954, "the aggregate amount of loans outstanding" from the partnership to Corning was $14,320.92. On brief the respondent states that the amount of $14,320.92 *380 represented a loan to Corning, but contends that there has been no showing that such loan was worthless in the partnership's taxable year ended June 30, 1954. We assume from this that the respondent contends that there has been no showing that the loan became worthless in that year. It may be added that in the partnership return for that year such amount was claimed as a deduction, not as a bad debt, but as a part of "Other Deductions" on account of "Real Estate Operation." The respondent further contends that if, as petitioners contend, Corning had no obligation to repay except out of profits, then the loan to Corning would not constitute a debt within the meaning of section 166(a) of the Internal Revenue Code of 1954. [21]
The petitioners contend on brief that this amount is *381 deductible by the partnership for its taxable year ended June 30, 1954, as a business bad debt, claiming that the loans were made in connection with a joint business venture. It is their contention that the debt became uncollectible in such taxable year of the partnership, since in April of that year the partnership itself took over the operation of the business, thereby leaving Corning no source out of which to repay the loan, inasmuch as the loan was repayable only out of profits of the real estate business. Section 166(a) provides for the deduction of any debt which becomes worthless. It has been held repeatedly that a debt does not exist, within the meaning of the statute, where the obligation to repay is subject to a contingency and the contingency has not occurred. Evans Clark 18 T.C. 780, and cases cited therein. See also Lucia Chase Ewing, 20 T.C. 216, affd. (C.A. 2) 213 F. 2d 438; Bercaw v. Commissioner, (C.A. 4) 165 F. 2d 521, affirming a Memorandum Opinion of this Court; and Zimmerman v. United States, (C.A. 9) 318 F. 2d 611. Here clearly the repayment of the advances was contingent upon the realization by Corning of profits in the real estate business, which did not *382 occur. Accordingly, despite the fact that both the petitioners and the respondent refer to the advances as loans, such advances cannot be considered as debts for purposes of section 166(a). It follows that the partnership is not entitled to deduct the amount in question as a bad debt. The petitioner does not claim that any portion of this amount is deductible as a loss in its taxable year ended June 30, 1954. In any event, the record does not establish that the partnership is entitled to a loss deduction for such year. The petitioners contend that the partnership is entitled to deductions, under section 165(a) of the 1954 Code, [22] for its taxable years ended June 30, 1955, and June 30, 1956, in the respective amounts of $841.43 and $5,512.37. The record is devoid of evidence to substantiate the claimed losses. All that the record shows is that on or about April 1, 1954, the partnership took over the operation of the real estate business and retained Corning to run it, that houses were purchased and sold *383 in the name of Jeremiah O'Donnell, Sr. , that some of these houses were sold at a profit, and that in June 1956, the partnership sold the business. Since the respondent disallowed the claimed loss deductions, the burden of proof was upon the petitioners to establish error in such determination by showing sufficient details to establish that losses were sustained and the amounts thereof. This they have not done. McKeon, comptroller of the partnership, testified that "the over-all operation was a loss," but this testimony falls far short of substantiating the claimed deductions. Under the circumstances we approve the respondent's disallowance of all the deductions claimed for the partnership's taxable years ended June 30, 1954, 1955, and 1956 arising out of the real estate operations. Barker Transactions The respondent disallowed the deduction of $15,460.58 claimed by the petitioner Jeremiah O'Donnell, Sr. in his return for the taxable year 1955, as a capital loss upon the complete liquidation of Paul A. Barker, Inc. There is apparently no dispute that the basis of his investment in the corporation was $37,500. However, the dispute between the parties has to do with the amount received *384 in liquidation. Upon the liquidation Jeremiah, Sr. received the corporation's account receivable against himself which was carried on the books at the amount of $24,500. However, it is clear that, for present purposes, this amount must be reduced by the amount of $3,540.29 which was included in this figure but which, in a prior year, had been treated for tax purposes as a dividend from the corporation to Jeremiah, Sr., rather than as a loan to him. In addition he received upon the liquidation cash in the amount of $1,104.71, which, however, must be reduced by the $25 corporate franchise tax which he subsequently paid. It is the respondent's position, in effect, that upon the liquidation of the corporation Jeremiah, Sr. succeeded to the corporation's claim against Barker in the amount of $14,775 and that this amount must be included as a part of the amount received upon distribution, since it has not been shown that the claim against Barker was worthless. We agree with the respondent that the petitioner has not met its burden of proof in this respect. Clearly, the petitioner as sole stockholder succeeded to any claim against Barker. There is no showing that Barker had repaid the corporation *385 or that the corporation had disposed of its claim. Nor has it been proved that the corporation had charged off the debt as worthless or that it was in fact worthless. There is no evidence as to Barker's assets and liabilities or as to his income. It is true that an attorney, who was acquainted with Barker, advised Jeremiah, Sr. that in his opinion Barker was not good for a judgment and advised against collection attempts. The attorney testified that he based his opinion upon the fact that he had known Barker for a number of years and that Barker had indicated to him that he was "having a rough time" at that time. However, he testified that he did not have personal knowledge of the assets which Barker owned. In this state of the record we cannot make a finding as to the fair market value of the corporation's claim against Barker, and therefore must include it at face value in the assets received by Jeremiah, Sr. upon the liquidation. It is our conclusion that upon the liquidation Jeremiah, Sr. sustained a deductible long-term capital loss of $685.58. The respondent also disallowed as a deduction to the partnership the amount of $3,000 claimed as a bad debt deduction on its return for *386 the taxable year ended June 30, 1955, representing the amount which it had loaned to Barker. Here again the only evidence as to the worthlessness of the debt consists of the testimony of the attorney as set forth above with respect to the loan by the corporation to Barker. Here again we must also conclude that the evidence is inadequate to meet the burden of proof of showing that the debt became worthless in the partnership's taxable year ended June 30, 1955, and we accordingly approve the respondent's disallowance of the claimed deduction. Travel, Entertainment and Advertising Expenses The Partnership: Of the total amount of $9,827.58 claimed by the partnership in its return for its taxable year ended June 30, 1954, as deductions for travel, selling and advertising expenses, the respondent disallowed $3,000, and of the total amount of $18,181.89 so claimed in the partnership's return for its taxable year ended June 30, 1956, he disallowed $5,000. His grounds were that to this extent the expenses had not been substantiated and that they were deemed personal expenses. At the hearing the petitioners produced various checks and vouchers to substantiate payments made for travel and entertainment *387 (or selling) expenses, and summaries representing analyses of the travel and selling accounts were introduced in evidence with respect thereto. We are satisfied from these summaries and the other evidence that expenditures in the total amounts claimed by the petitioners were made by the partnership for travel and entertainment for each of the years in question. The summaries were not introduced in evidence as proof of the character of the expenditures - that is, whether they were business expenses. However, McKeon, comptroller of the partnership, testified as to the business necessity for the travel and entertainment and that the amounts of $7,281.38 and $15,949.72 were expended by the partnership for those purposes in its taxable years ended June 30, 1954 and June 30, 1956, respectively. There is no evidence which indicates or implies that any portion of these amounts constituted other than business expenses of the partnership. We hold that the respondent erred in disallowing any portion of such claimed travel and entertainment (or selling) expenses. Attached to the above summaries were lists purporting to show that in the years in question amounts were expended for advertising in *388 the amounts claimed. However, when these summaries were introduced in evidence no mention whatever was made as to the presence in the courtroom of any documents or substantiation of the summaries with respect to advertising. Indeed, no mention whatever was made of such expenditures. Neither McKeon or any other witness testified with respect to advertising expenses. Under the circumstances, we find no basis whatever in the record for holding that the amounts claimed as deductions on account of advertising expenses are allowable. While it may well be that the partnership did have bona fide advertising expenses, we cannot afford any relief to the petitioners in the absence of evidence. Jeremiah O'Donnell, Sr.: The petitioner Jeremiah O'Donnell, Sr. contends that although he did not keep itemized records of expenditures which he personally made and for which he was not reimbursed, he should be allowed in each of the taxable years 1954, 1955, and 1956, under the principle of Cohan v. Commissioner, supra, as ordinary and necessary business expense deductions, some amounts on account of expenditures for travel and entertainment. He testified that he believed that he spent a great deal more *389 for these purposes than he claimed in his returns. However, he also testified that any amounts which he expended were in behalf of the partnership or Alden or Woolens. Under these circumstances, it is clear that any amounts which he expended were not ordinary and necessary expenses of any business which he personally carried on, but were expenses of the two corporations and the partnership, and that hence he is not entitled to deductions on account thereof. See Andrew Jergens, 17 T.C. 806. It may be added with respect to any expenditures which he made on behalf of the partnership, that the evidence shows that the partnership had a policy of reimbursing any of the partners or employees for expenditures made on its behalf. Under the circumstances, we approve the respondent's disallowance of the claimed deductions. In view of this conclusion it is unnecessary to make an approximation of amounts expended pursuant to the decision in Cohan v. Commissioner, supra.
Jeremiah O'Donnell, Jr.: The petitioner Jeremiah O'Donnell, Jr. concedes on brief that he did not keep itemized records of the expenditures which he personally made, and for which he was not reimbursed, but contends that he should *390 be allowed in each of the taxable years 1954, 1955, and 1956, under the principle of Cohan v. Commissioner, supra, as ordinary and necessary business expense deductions, some amounts on account of expenditures for travel and entertainment. Jeremiah, Jr. testified that he spent at least as much as he claimed in his returns for travel and entertainment purposes. However, here again it appears that any expenditures which he made were connection with the business of the partnership or the corporations, rather than in connection with any business which he personally carried on. For the same reasons given in the case of Jeremiah, Sr., we hold that the respondent did not err in disallowing these deductions claimed by Jeremiah, Jr. Charitable Contributions Of the amount of $4,115 claimed as deductions for 1954 by the petitioners, Jeremiah O'Donnell, Sr. and Margaret O'Donnell, as religious and charitable contributions, the respondent disallowed $850 for lack of substantiation. The petitioners submitted a list containing an analysis of the claimed amount of $4,115. It showed a total amount of $1,498 of claimed contributions for which the petitioners had no canceled checks or other documentary *391 evidence of payment. With respect $603to of this amount, there was neither documentary evidence nor testimony. Clearly we have no basis for holding that the respondent erred in disallowing this much of the claimed deduction. It may be added that it appears that $150 of this amount of $603 appears, from the summary submitted, to be a duplication of items claimed which were represented by canceled checks. The remainder of the claimed contributions which were not represented by canceled checks consisted of $895 to St. Joseph's Church of Bronxville, New York. The total amount claimed as contributions to St. Joseph's Church was $1,345, of which $450 was paid by check. The petitioner Jeremiah, Sr. testified that he attended this church each Sunday and holiday and also at other times and always contributed some amount. He does not have a record of the amounts which he contributed other than by check, and he testified that he did not use the envelope system. It appears that the claimed amount of $895 was an estimate. He did not testify that he knew how much in the aggregate he contributed in cash to the church, but merely stated that his cash contributions ranged from $1 to $20. Under the *392 circumstances, we cannot conclude that the respondent erred in disallowing $850 of the religious and charitable deductions claimed, and his determination in this respect is approved. Decisions will be entered under Rule 50. Footnotes
*. Proceedings of the following petitioners are consolidated herewith: J. J. O'DONNELL WOOLENS, INC., Successor by Merger to J. J. O'Donnell, Inc., Docket No. 94913; J. J. O'DONNELL WOOLENS, INC., Docket No. 94914; JEREMIAH J. and MARGARET C. O'DONNELL, Docket No. 94915; and JEREMIAH J. and JOAN O'DONNELL, JR., Docket No. 94916.↩
1. On July 13, 1955, the six individuals certified that they were conducting a textile selling agency business as co-partners under a fictitious name in Los Angeles, California, which certificate was published in a Los Angeles newspaper on four dates.
*. Includes dividend income of $937.50. ** Includes dividend income of $4,550.↩
2. The partnership returns show that at the end of its fiscal years ended June 30, 1953, 1954, 1955, and 1956 the partnership held investments in the total amounts of $298,579.85, $240,670.23, $939,608.33, and $761,383.94, respectively.
3. Such machinery and equipment had a depreciated cost on the books of Wuskanut at November 30, 1952, of $206,142.28.↩
4. Although the advertisement for the auction indicated that all of Wuskanut's assets were for sale, the advertisement was framed in accordance with common practice in the industry in order to attract a maximum number of prospective purchasers. There was no intention of selling the land and building. It was intended to sell a substantial portion of the fixed assets.↩
5. At some time prior to June 30, 1955, J. J. O'Donnell, Inc. was negotiating with two banks separately for a loan of $1,000,000 in order to enter into the production of cashmere products. Each bank, independently of the other, agreed that it would make a loan of $1,000,000 if J. J. O'Donnell, Inc. and Alden were merged, since this would result in a combined net worth in excess of $1,000,000. A loan was obtained from one of the banks after the merger was accomplished.↩
6. About that time the partnership was in the process of opening a sales office in Los Angeles, California, and it sent a representative from New York to Los Angeles for such purpose. Attorneys for the partnership advised its vice president and comptroller to adopt a corporate form in order to limit the risk of personal liability arising from the operation of the new sales office. ↩
7. Each of the banks above referred to suggested to J. J. O'Donnell, Inc. that the operation of the interests owned by the O'Donnells would be simpler if separate organizations were used for selling and for manufacturing. At this time J. J. O'Donnell, Inc. was acting as selling agent for both Somersville and Alden. The prospective merger of J. J. O'Donnell, Inc. and Alden would result in the manufacture by the surviving corporation of products previously manufactured by Alden which were in competition with products manufactured by Somersville. The O'Donnells believed it inadvisable to have the surviving corporation selling these competing products, and that Somersville would object to such a situation, and, therefore, decided to reconvey the selling business to the partnership.
8. If the partnership paid such fees at the rate of $900 per month for the first 6 months of such taxable year the amount paid for the year would be $5,400. The difference of $2,400 is unexplained. In any event the petitioners do not claim that a deduction should be allowed in a greater amount than $3,000.↩
9. The return does not show how the figure of $22,039.42 was computed. However, it seems clear that it consists of cash of $1,104.71, plus net notes receivable of $20,959.71 ($24,500 less $3,540.29 previously taxed as a dividend), less $25 New York franchise tax subsequently paid.↩
10. Section 704 of the Internal Revenue Code of 1954 provides in part as follows: (a) Effect of Partnership Agreement. - A partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this section, be determined by the partnership agreement. * * *
(e) Family Partnerships. - (1) Recognition of Interest Created by Purchase or Gift. - A person shall be recognized as a partner for purposes of this subtitle if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person. (2) Distributive Share of Donee Includible in Gross Income. - In the case of any partnership interest created by gift, the distributive share of the donee under the partnership agreement shall be includible in his gross income, except to the extent that such share is determined without allowance of reasonable compensation for services rendered to the partnership by the donor, and except to the extent that the portion of such share attributable to donated capital is proportionately greater than the share of the donor attributable to the donor's capital. * * *.
(3) Purchase of Interest by Member of Family. - For purposes of this section, an interest purchased by one member of a family from another shall be considered to be created by gift from the seller, and the fair market value of the purchased interest shall be considered to be donated capital. The "family" of any individual shall include only his spouse, ancestors, and lineal descendants, and any trusts for the primary benefit of such persons. Sections 191 and 3797(a)(2) of the Internal Revenue Code of 1939 contain substantially the same provisions as contained in section 704(e)↩ of the 1954 Code.
11. We are not unmindful of the provision contained in section 1.704-1(e)(1)(iv) of the Income not a material income-producing factor where Tax Regulations that "In general, capital is not a material income-producing factor where the income of the business consists primarily of fees, commissions, or other compensation for personal services performed by members or employees of the partnership." However, as also stated in such regulation, the determination as to whether capital is a material income-producing factor must be made by reference to all the facts of each case.↩
12. Section 23(s) of the 1939 Code provides for the deduction of the net operating loss deduction computed under section 122. Section 122(b)(2)(B) of the 1939 Code provides in part: Loss for taxable year beginning after 1949. - If for any taxable year beginning after December 31, 1949, the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carry-over for each of the five succeeding taxable years * * *.
Section 172 of the Internal Revenue Code of 1954provides in part: (g) Special Transitional Rules. - (1) Losses for taxable years ending before January 1, 1954. - For purposes of this section, the determination of the taxable years ending after December 31, 1953, to which a net operating loss for any taxable year ending before January 1, 1954, may be carried shall be made under the Internal Revenue Code of 1939.↩
13. The record is not clear whether the corporation continued to operate the selling business which it had acquired as a result of its prior merger with J. J. O'Donnell & Co., Inc., or whether it transferred to the partnership that selling business as well as the selling business which it had previously acquired from the partnership on January 4, 1954.↩
14. Section 129(a) of the 1939 Code provides in part as follows: If (1) any person or persons acquire, on or after October 8, 1940, directly or indirectly, control of a corporation * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income or excess profits tax by securing the benefit of a deduction, credit, or other allowance which such person * * * would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed * * *.↩
15. Had Wuskanut sold its assets to the partnership and derived a gain therefrom, its tax liability apparently would have been unaffected, since it would have had an offsetting net loss carryover. ↩
16. The petitioner argues that the fact that the partnership included in its offer to the stockholders of Wuskanut an alternative offer to purchase the fixed assets of Wuskanut for the same price is, in and of itself, proof that the principal purpose for obtaining control of Wuskanut was to acquire assets, and not to obtain the tax benefit of Wuskanut's net operating loss. We think this fact is not conclusive. The testimony of both Pease and McKeon indicates that all parties contemplated the sale of stock, and that the alternative offer to purchase assets was inserted at the insistence of Pease as a hedge in the event he could not obtain all the shares of the stockholders. Pease testified that at the time the offer was made in writing by the partnership a majority of the stockholders of Wuskanut had approved the sale of stock. There is no evidence in the record to indicate any probability that there would be any dissenting stockholders. Under the circumstances, it would seem that the possibility that the transaction would be a sale of assets, rather than stock, was remote.
17. In its return for the calendar year 1952 the partnership reported gross commissions of about $465,000 and ordinary net income of about $150,000.↩
18. In the Libson Shops case the Supreme Court stated in part: The requirement of a continuity of business enterprise as applied to this case is in accord with the legislative history of the carry-over and carry-back provisions. Those provisions were enacted to ameliorate the unduly drastic consequences of taxing income strictly on an annual basis. They were designed to permit a taxpayer to set off its lean years against its lush years, and to strike something like an average taxable income computed over a period longer than one year. There is, however, no indication in their legislative history that these provisions were designed to permit the averaging of the pre-merger losses of one business with the post-merger income of some other business which had been operated and taxed separately before the merger. What history there is suggests that Congress primarily was concerned with the fluctuating income of a single business. * * *
We find nothing in those provisions which suggest that they should be construed to give a "windfall" to a taxpayer who happens to have merged with other corporations. The purpose of these provisions is not to give a merged taxpayer a tax advantage over others who have not merged. We conclude that petitioner is not entitled to a carry-over since the income against which the offset is claimed was not produced by substantially the same businesses which incurred the losses.
19. Section 482 provides as follows: In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.↩
20. Included among such cases are Seminole Flavor Co., 4 T.C. 1215; T.V.D. Co., 27 T.C. 879; and Interior Securities Corp., 38 T.C. 330↩.
21. Section 166(a) provides as follows: (a) General Rule. - (1) Wholly Worthless Debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially Worthless Debts. - When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.↩
22. Section 165(a) provides as follows: General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.↩